**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | |
|---|---|
| **FOREFRONT DERMATOLOGY, S.C.,** | |
| **Plaintiff,** | **Civil Action No.** |
| | **1:23-cv-01333-WCG** |
| **vs.** | |
| **SHENARA AUSTIN SEXTON,** | |
| **Defendant.** | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**MOTION TO DISMISS COMPLAINT FOR LACK OF SUBJECT MATTER**</u>
<u>**JURISDICTION AND FOR FAILURE TO STATE A CLAIM FOR RELIEF**</u>
<u>**WHICH CAN BE GRANTED**</u>

COMES NOW, Defendant Shenara Sexton, M.D., (hereinafter "Dr. Sexton") and hereby and pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) files this Memorandum of Law in Support of her Motion to Dismiss Complaint based upon the failure to state claim for which relief can be granted and the lack of subject matter jurisdiction. In support of this Motion, and for good cause, Dr. Sexton shows this Court as follows:

<u>**INTRODUCTION**</u>

Forefront Dermatology has filed this breach of contract action, apparently without any recognition of the imagery, as it seeks to force an African-American woman from the South to be coerced by law and threat of debt to provide involuntary servitude to the company, even if it means a forced separation from her husband and child. Slavery and forced labor ended after the Civil War and enactment of the 13th Amendment to the U.S. Constitution, but Forefront Dermatology believes a system of peonage is necessary for it to control its employees. As demonstrated herein, the "contract" terms it wants to enforce are illegal, its claims are not ripe for adjudication, and the

lawsuit is due to be dismissed. Perpetuating an employment scheme that resembles involuntary servitude is not an effective means of recruiting physicians.

## PROCEDURAL AND FACTUAL BACKGROUND

The facts herein are taken from the Complaint filed by Forefront, the exhibits to that Complaint, including the full contractual agreement between Dr. Sexton and Forefront, the Amendment, and the letter from Dr. Sexton to Forefront requesting an amicable termination of her employment at some future date.

Dr. Sexton worked part-time, 21 hours a week as a dermatologist for Forefront, beginning on October 25, 2021 for a salary of $275,000 per year. She was not a partner in the medical practice and had no ownership interest. As part of her employment, she was required to sign Forefront's standard employment agreement, the terms of which were drafted solely by Forefront.

In August 2023, Dr. Sexton's family situation changed. Her husband left his job in Atlanta, and obtained a new, higher-paying job in Chicago, Illinois. In order for her son to start school at the beginning of the year, her husband and child relocated to Illinois in the summer. Dr. Sexton advised Forefront of the change in her family situation and her need to relocate to be with her husband and child. Astoundingly, Forefront demanded she stay in Atlanta, continue to labor for them for another full year while enduring the separation from her family. After several attempts to reach an amicable solution, Dr. Sexton told Forefront that she would continue for an additional 90-day + period, and would help them to find a replacement physician for her during that time period. That time period has not yet expired.

Dr. Sexton remains a dedicated employee committed to working for Forefront and to helping them find a replacement physician for her part-time practice until December 1. She also has offered to continue her employment with Forefront in Illinois where she is relocating to be

with her family. As shown in the letter, she offered to extend her employment to assist Forefront with the transition to a new physician in the event one is located prior to December 1, 2023.

Instead of showing any understanding for her changed family circumstances, instead of accepting her efforts to minimize the harm to the company, and instead of showing any regard for human decency at all, Forefront filed this lawsuit against her in Wisconsin, seeking by use of threats, coercion and legal force to compel her to continue her indentured servitude to the company.

Forefront's Complaint claims daily damages of $2500 per day, for **every day of the week,** including days when the Atlanta office is not open and has no revenue, and more astoundingly, for days that Dr. Sexton (a part time employee) would have never worked for the company.

In her letter to Forefront, Dr. Sexton pledged to work with Forefront to assist them with what the contract stated was their need to "(1) identify suitable physicians who may be interested in the position, (2) interview and negotiate with such candidates," and (3) assist Forefront with "licensing, contracting and credentialing" a replacement throughout here remaining time at Forefront. *See* Dkt. No. 1, Ex. 3. Forefront's Complaint *does not allege* that it has mitigated its alleged damages by taking any actions to identify physicians, recruit physicians, or obtain licenses, contracts or credentials from any physicians. Forefront's Complaint fails to make any allegation that it will be unable to find a suitable replacement for Dr. Sexton's part-time work, or that it has even tried to do anything to identify a replacement. Forefront also fails to address her offer to continue her employment in Illinois. Forefront alleges nothing in the Complaint other than its goal to coerce her through litigation to remain separated from her family and indentured in servitude to Forefront. Forefront's Complaint assumes it is entitled to damages without it undertaking any of the duties set out in its own contract.

Thus, this "dispute," even on the face of the Complaint, involves an attempt by Forefront to coerce, threaten and intimidate an employee to continue her peonage/indentured servitude to the company, at the threat of imaginary and grossly inflated "damages," based on an event ***that has not occurred***. For the legal reasons that follow, this Court should dismiss this Complaint.

## ARGUMENT AND CITATION OF AUTHORITY

A.    Plaintiff's Breach of Contract Complaint Fails to State A Claim for Relief Under Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The purpose of this requirement is "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The plaintiff must have pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534 (7th Cir. 2012).

The Seventh Circuit recently reminded that "*Twombly* bars the discover-first, plead-later approach." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021). A pleading that offers "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555). When a complaint's facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal* at 679, 129 S.Ct. 1937 (quoting FED. R. CIV. P. 8(a)(2)).

That means a complaint must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678, 129 S.Ct. 1937. "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at

557, 127 S.Ct. 1955)(internal brackets omitted). In keeping with these principles, when considering the viability of a claim in the face of a Rule 12(b)(6) challenge, the Court may reject sheer speculation, bald assertions, and unsupported conclusory statements. *Iqbal*, 556 U.S. at 678, 681, 129 S.Ct. 1937; *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955; *Taha v. Int'l Bhd. of Teamsters*, 947 F.3d 464 (7th Cir. 2020).

While the Court is undoubtedly familiar with these standards, the "plausibility," "speculation," and "mere possibility" standards in *Iqbal* and *Twombly* are important to this Motion. Plaintiff's allegations of an actual breach of contract are not plausible, its claim of damages are mere possibilities, and the facts it does plead fail to provide an enforceable legal basis for Forefront to claim $820,000 in monetary damages against Dr. Sexton.

1.      The Damages Plaintiff Claims in the Contract are Illegal and Unenforceable.

Plaintiff's entire breach of contract claims rests upon a legally invalid "liquidated damages" clause that requires Dr. Sexton to pay an exorbitant amount to Forefront as a punishment should she not continue her servitude and labor for it.  The contract requires this Court to apply Georgia law.  *See*, Employment Agreement Sec. 9.5.  This choice of law provision is particularly awkward given the permissive jurisdiction clause suggesting that Forefront can file this lawsuit in this court in Wisconsin, a place Dr. Sexton has never been and which has no nexus to the legal issues before the Court.  Hence, in addition to this Motion to Dismiss, Dr. Sexton has also this same date filed a Motion to Transfer Venue to the United States District Court for the Northern District of Georgia. Dr. Sexton asks this Court to grant the Motion to Transfer Venue and allow the Northern District of Georgia court to rule upon this Motion to Dismiss.

Substantively, in Georgia, as is true in basically every state, "Impossible, immoral, and illegal conditions are void and are binding upon no one." O.C.G.A. § 13-3-5; *PraultShell, Inc. v.*

*River City Bank*, 366 Ga. App. 70, 880 S.E.2d 616 (2022). To the extent the Employment Agreement seeks to impose illegal or immoral clauses on Dr. Sexton – such as a condition of involuntary servitude, peonage, or coerced labor, they are unenforceable and cannot state a claim for relief.

   2.  <u>Forefront's Claim for "Damages" Based Upon Dr. Sexton's Decision not To Continue to Labor for the Company is an Illegal Effort to Enforce Involuntary Servitude, Peonage and Trafficking.</u>

Forefront's Complaint alleges that Dr. Sexton must continue to work for the company for nearly another full year until October 24, 2024 or be compelled to pay a penalty of $820,000 as a punishment to end her servitude. Since shortly after the Civil War, both Georgia and the United States have outlawed contracts such as these, finding that "contracts" that do not allow an individual to voluntarily cease his or labor without punishment are little more than thinly-veiled indentured servitude agreements.

Immediately following the Civil War and enactment of the 13th Amendment, Georgia courts were clear that attempting to use the courts to compel involuntarily labor for an employer was little more than slavery. "We are not aware of any power possessed by a court of equity, or any other court, to compel a party to perform personal service for another, which he had contracted to perform, but was unwilling to render; this would reduce him to involuntary servitude, not as a punishment for crime, but for an alleged breach of contract, and would be directly in the teeth of the constitution." *Willingham v. Hooven*, 74 Ga. 233, 58 Am. Rep. 435 (Ga. 1884).

As the Jim Crow era overtook Reconstruction, Georgia was not immune from creative efforts to use contract law as a work-around to coerced labor. Georgia passed a "labor contract act" that provided a financial penalty to persons who left their employment, as part of an effort to prop up sharecropper contracts. The United States Supreme Court struck that act down in 1942 as

unconstitutional. *See Taylor v. Georgia*, 315 U.S. 25, 31, 62 S.Ct. 415 (1942).  This labor contract statute forced persons to repay debts on employment contract advancements, and if they failed to do so, they were subject to financial penalty and criminal sanctions.  The U.S. Supreme Court found the case indistinguishable from Alabama's similar servitude statute in *Bailey v. Alabama*, 219 U.S. 219 (1911).

    In both cases, the U.S Supreme Court reasoned, the "necessary consequence" was that the assessment of damages on a contract for services "for which he is unable to repay is bound by the threat of penal sanction to remain at his employment until the debt has been discharged."  *Taylor*, at 29, 62 S.Ct. 415. "Such coerced labor is peonage," which "is a form of involuntary servitude within the meaning of the Thirteenth Amendment," and "it is no less so because a presumed initial fraud rather than a subsequent breach of the employment contract is the asserted target of the statute." *Id.*

In *Sratacos v. State*, 293 Ga. 401, 748 S.E.2d 828 (2013), the Georgia Supreme Court further clarified that the fatal flaw in Georgia's labor statute, as held in *Taylor*, was the presumption that the failure to perform the work was done with intent to harm the employer.  "Georgia's labor contract act was just one of many Jim Crow statutory schemes that used criminal sanctions, or the threat of criminal sanctions, to coerce African–Americans into providing labor. *See generally* Douglas A. Blackmon, Slavery By Another Name: The Re–Enslavement of Black Americans From the Civil War to World War II (2009)." *Stratacos v. State*, 293 Ga. 401, 748 S.E.2d 828 (Ga. 2013). This is the history that Forefront's lawsuit draws upon.

Forefront cannot pretend its innocence by saying it is not forcing Dr. Sexton's labor, but merely seeking enforcement of a debt for her failure to perform labor.  United States courts have long recognized such debtor arrangements as "peonage."  Peonage is a "condition of compulsory

service, based upon indebtedness of the peon to the master." *United States v. Reynolds*, 235 U.S. 133, 144, 35 S.Ct. 86, 88 (1914); *Clyatt v. United States*, 197 U.S. 207, 215, 25 S.Ct. 429, 430, (1905).

Peonage is recognized as a form of involuntary servitude. *Taylor v. Georgia*, 315 U.S. 25, 29, 62 S.Ct. 415 (1942), and is characterized by the involuntary performance of labor based upon indebtedness. *Reynolds*, 235 U.S. at 144, 35 S.Ct. at 88; *Clyatt*, 197 U.S. at 215, 25 S.Ct. at 430. Thus, the critical elements of a peonage claim are indebtedness and compulsion. *Reynolds*, 235 U.S. at 144, 35 S.Ct. at 88; see *Turner v. Unification Church*, 473 F.Supp. 367, 375 (D.R.I.1978) (Peonage is "compulsory service based upon the indebtedness of the peon to the master."), aff'd, 602 F.2d 458 (1st Cir.1979); see also *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir.1944); *Dolla v. Unicast Co.*, 930 F.Supp. 202 (E.D. Pa. 1996).

The U.S. Supreme Court long ago dispensed with the idea that a debt to a master in the servant/master relationship is not the same as peonage or involuntary servitude:

> The basal fact is indebtedness. . . One fact existed universally; all were indebted to their masters. . .Upon this is based a condition of compulsory service. Peonage is sometimes classified as voluntary or involuntary, but this implies simply a difference in the mode of origin, but none in the character of the servitude. The one exists where the debtor voluntarily contracts to enter the service of his creditor. The other is forced upon the debtor by some provision of law. But peonage, however created, is compulsory service, involuntary servitude."

*United States v. Reynolds,* 235 U.S. 133, 35 S.Ct. 86 (1914).

Counsel has not identified any case in Georgia (at least not since the days of Jim Crow), allowing an employer to recover damages, particularly those as excessive as Forefront seeks here, simply because an employee chooses not to continue to serve her employer. Georgia is an employment at will state, and does not recognize any claim for breach of contract damages against an employer or employee when a termination of employment occurs, with or without cause, in

-8-

employment of an indefinite term. O.C.G.A. § 34-7-1. *Culpepper v. Thompson*, 254 Ga. App. 569, 562 S.E.2d 837 (2002)(tortious interference with contract claim by competitor failed to state a claim when employment was at will). This employer right, combined with the Thirteenth Amendment's prohibition on involuntary servitude, means the typical employer/employee relationship can be ended by an employee or employer at any time. The law does not recognize forced labor. Forefront seeks to impose a duty upon Dr. Sexton to remain working for it, or to pay a peonage penalty, should she desire to cease her servitude to her employer. This is an illegal clause.

Federal law also prohibits claims for damages arising out of the coerced labor of employees. 42 U.S.C. § 1994 states as follows: "The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States ... and the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void."

The Trafficking Victims Prevention Act, passed in 2000, sought to make the types of abusive contracts Forefront seeks to enforce here illegal. 18 U.S.C. § 1589 makes it illegal to: "provide or obtain the labor or services of a person--(1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or ***(3) by means of the abuse or threatened abuse of law or the legal process.***" (emphasis added).

In *Paguirigan v. Prompt Nursing Employment Agency, LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017), the court considered an employment contract with nurses substantially similar to the one Forefront seeks to enforce here. In that case, the contract required employee nurses who

terminated employment before a defined term to pay a $25,000 termination fee. The employment agency sued several nurses who left their employment, and the nurses eventually filed a lawsuit alleging a violation of 18 U.S.C. § 1589.[1] The district court found that the employment agency's threats of filing, and the actual filing of a lawsuit, to collect the "termination fee" were sufficient allegations of a threats of serious harm and abuse of the legal process to state a claim for violation of the anti-trafficking statutes. The district court's reasoning and citation of precedent is worth considering in full:

> In *United States v. Kozminski*, the Supreme Court held that '[a]bsent change by Congress,' the term 'involuntary servitude' in 18 U.S.C. §§ 241 and 1584 necessarily means '***a condition of servitude in which the victim is forced to work for the defendant*** by the use or threat of physical restraint or physical injury, or ***by the use or threat of coercion through law or the legal process***.' 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). *See also United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011); *Javier v. Beck*, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014). With the passage of § 1589 of the TVPA, enacted after the *Kozminski* decision, Congress expanded the scope of cases that could be prosecuted to include those involving non-violent coercion. It articulated four different means by which labor could be unlawfully obtained and defined 'serious harm' broadly as 'any harm, whether physical or nonphysical, including psychological, financial, or reputational...' 18 U.S.C. §§ 1589(a) and (c). In adopting such a broad definition of 'serious harm,' Congress pointedly declared that 'prosecutors will not have to demonstrate physical harm or threats of force against victims' to prove liability under § 1589. H.R. Conf. Rep. No. 106–939, at 101 (Oct. 5, 2000); *Saraswat v. Selva Jayaraman Bus. Integra, Inc.*, 2016 WL 5408115, at *3–*4 (E.D.N.Y. Sept. 28, 2016). Thus, § 1589 was intended to 'provide federal prosecutors with the tools to combat severe forms of worker exploitation' and to address situations in which 'traffickers threaten harm to third persons' or 'restrain their victims without physical violence,' all while taking into account 'the individual circumstances of [the] victim[ ]... including age and background." H.R. Conf. Rep. No. 106–939, at 101.
>
> ***The threat of financial harm constitutes serious harm within the meaning of the TVPA. Dann, 652 F.3d 1160 at 1170–71. In Dann, the Ninth Circuit held that an employer's threat that a foreign worker would owe $8,000 if she quit constituted threat of 'serious harm' under the TVPA.*** Id. at 1171. Here, plaintiff alleges that she was not only threatened with the prospect of paying a $25,000 contract termination fee—more than three times the amount threatened in Dann —she also was actually sued for recovery of both the $25,000 fee and $250,000 in tort damages. Allegations of such a severe financial burden are more

---

[1]    18 U.S.C. § 1595 authorizes civil lawsuits by individuals who allege they were harmed by a violation of the criminal trafficking statutes.

than enough to rise to the level of harm necessary to state a TVPA claim. *See also Javier*, 2014 WL 3058456, at *6 (threatened enforcement of $15,000 confession of judgment constitutes threat of serious harm); *Nunag– Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011) (threatened payment of $10,000 constitutes threat of serious harm).

*Paguirigan* 286 F.Supp.3d at 437-38 (emphasis added).

The district court rejected arguments by the employer that it was not threatening the employee by suing her. "That plaintiff was physically able to leave her employment and eventually did so is not determinative in light of the termination fee, threat of suit, and eventual lawsuit that she alleges were intended to coerce her to stay." *Paguirigan,* 286 F.Supp.3d at 439.[2]

In this case, Forefront sued Dr. Sexton in Wisconsin *before* her planned relocation to Chicago to be with her family. Forefront admits in its Complaint that 1) it is seeking to compel Dr. Sexton to remain employed in Atlanta or else it will pursue this lawsuit against her for an amount of damages three times larger than her salary (Comp. ¶ 24); 2) Dr. Sexton attempted a mutual agreement on the termination of her employment and Forefront refused to allow her to leave (Comp. ¶ 19); and 3) it made additional demands ("proposals") to Dr. Sexton for her to continue providing labor against her will (Comp. ¶ 20). This case is directly comparable to the conduct the court found illegal in *Paguirigan.*

The damages clause Forefront seeks to enforce in this litigation is an illegal provision that attempts, through abuse of the legal process, and threat of severe financial harm to Dr. Sexton, to compel her to involuntarily continue to labor for Forefront, and to accept separation from her child and husband as a necessary consequence of the employment contract. The Court should not

---

[2]    Notably, nothing in this statute or several other provisions in the TVPA limits its prohibitions to foreign trafficking. It is just as illegal for Forefront to coerce a United States citizen into involuntary servitude through threats and abuse of legal process as it would be to coerce a foreign national.

enforce an illegal provision requiring that Dr. Sexton pay three times her annual salary should she decide she no longer wishes to be in servitude to Forefront. Forefront has chosen to align its employment practices with the tactics used to promote slave labor, peonage, Jim Crow sharecroppers, and sex traffickers. Asking this Court to enforce its terms fails to state a claim for relief that any United States court should grant.

       3.     <u>Forefront's Claim for Liquidated Damages is an Unenforceable Penalty.</u>

Even if Forefront claims it is merely seeking "damages" for Dr. Sexton's desire to be reunited with her family and not illegally attempting to force her into continued servitude, its claim for liquidated damages under Section 5.2 of the Agreement is not enforceable under Georgia law. *See* Dkt. No. 1, Ex. 1. In Georgia, where a liquidated damages clause "plainly has no reasonable relation to any probable actual damage which may follow a breach, the contractual provision will be construed as an unenforceable penalty." *Lager's LLC v. Palace Laundry, Inc.*, 247 Ga. App. 260, 543 S.E.2d 773 (Ga. App. 2000).

The enforceability of a liquidated-damages provision in a contract is a question of law for the court. *Daniels v. Johnson,* 191 Ga. App. 70, 381 S.E.2d 87 (1989). Georgia Courts use a tripartite test to determine whether a provision is a properly executed liquidated damages clause or an unenforceable penalty. *Roswell Properties v. Salle*, 208 Ga. App. 202, 204, 430 S.E.2d 404 (1993); *Peterson v. P.C. Towers, L.P.,* 206 Ga. App. 591, 592, 426 S.E.2d 243 (1992); *Daniels v. Johnson*, 191 Ga. App. 70, 381 S.E.2d 87 (1989) (collecting cases applying tripartite test). First, the injury caused by the breach must be difficult or impossible to accurately estimate. *Southeastern Land Fund, Inc. v. Real Estate World, Inc.*, 237 Ga. 227, 230, 227 S.E.2d 340 (1976). Second, the parties must intend to provide for damages rather than for a penalty. *Id*. And third, the sum stipulated must be a reasonable pre-estimate of the probable loss. *Id.*

-12-

Georgia Courts have consistently held that "[a] term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty." *See Aflac, Inc. v. Williams*, 264 Ga. 351, 444 S.E.2d 314, 317 (1994). *See also City of Brookhaven v. Multiplex, LLC,* 2023 WL 4779591, at *2 (holding that "where a designated sum is inserted into a contract for the purpose of deterring one or both of the parties from breaching it, it is a penalty" (citation omitted)). In *National Emergency Services, Inc. v. Wetherby,* Wetherby's employment contract contained a liquidated damages provision in the event he violated a post-employment covenant against competition. *Nat'l Emergency Services, Inc. v. Wetherby*, 217 Ga. App. 42, 456 S.E.2d 639, 640 (1995). National brought suit against Wetherby seeking to enforce the "liquidated damages" provision of the contract. *Id.* Wetherby moved for summary judgement arguing, in part, that the liquidated damages provision was in fact a penalty. *Id*. The Georgia Court of Appeals granted summary judgment in favor of Wetherby stating that "we fail to see a connection . . . between the $25,000 sum and a competent estimation of probable loss." *Id*. at 642.

Similar to *Wetherby*, there is no reasonable connection between the claimed "liquidated damages" clause of $2,500 per day – every day – and a competent estimation of probable loss. *See Daniels*, 191 Ga. App. at 70 (holding that agreements to pay fixed sums that have no reasonable relation to any probable actual damage will not be enforced, and will be treated as an unenforceable penalty clause). In other words, the sum stipulated as liquidated damages must be a reasonable pre-estimate of the probable loss. *Wetherby*, 456 S.E.2d at 641.

Here, the absurdity of the penalty is borne out from Forefront's Prayer for Relief. Forefront interprets its own contract to require payment of $2500 per day for *every day of the week*, including days when its clinics are not even open, and including days that its own Complaint admits Dr. Sexton would not have worked for Forefront. Its interpretation of the contract must be taken as

-13-

true at this stage.  Plainly, without any additional evidence, $820,000 in financial damages is not a plausible estimate of the cost of replacing a part-time employee who has no partnership interest in the practice and whose salary ($275,000) is one-third of the amount sought.  Claiming financial damages on days the clinic is not even open is not a plausible estimate of any future losses. Forefront's prayer for relief is an obvious unenforceable penalty.  $820,000 bears no rational relationship to any plausible damages Forefront could suffer.  The Complaint claims relief which this Court cannot grant.

4.    Forefront's Alternative Request for Actual Damages Fails to State A Claim for Relief Because No Arguable Breach Has Occurred and There Are No Damages.

Forefront filed this Complaint in Wisconsin while Dr. Sexton remains employed at the Atlanta office, in a blatantly obvious effort to intimidate and coerce her to remain in the master/servant relationship to Forefront.  As a means of putting a thin veneer on its conduct, Forefront attempts to call Dr. Sexton's request to be reunited with her husband and child an "anticipatory breach" of the contract that "will" cause Forefront damages in the future.  The Court cannot grant relief to this made-up alternative claim.

First and obviously, Forefront's Complaint cannot allege an actual breach of contract to have occurred given the undisputed fact that Dr. Sexton is still currently employed by and performing services for Forefront.  The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken.  *Oconee Fed. Sav. & Loan Ass'n v. Brown*, 351 Ga. App. 561, 831 S.E.2d 222 (2019); *Kuritzky v. Emory Univ.*, 294 Ga. App. 370, 371, 669 S.E.2d 179 (2008).  Since the breach has not occurred, any claim of future damages is by definition speculative.  Moreover, the Employment Agreement specifically claims its damages originate from any efforts to hire a replacement physician, s*ee*, Section 5.2, but the Complaint makes no allegation that Forefront has

-14-

actually incurred any such costs prior to filing this lawsuit. Forefront's Complaint is nothing more than the "discover-first, plead-later" approach prohibited by *Twombly* and *Iqbal.*

It should be no surprise that there is no case in Georgia describing how to calculate "damages" from an anticipatory breach of an employment agreement when an employee/servant desires to cease to labor for the employer/master. Other contract cases alleging an anticipatory breach typically involve a demand for specific performance. *See, e.g., Wallace v. Wallace*, 345 Ga. App. 764, 813 S.E.2d 248 (Ga. App. 2018)(approving specific performance award requiring repurchase of shares in closely held business). The most proper legal remedy for an anticipatory breach thus runs into the harsh reality that such relief requires an order of involuntary servitude were Dr. Sexton forced to remain in a coerced employment relationship with Forefront. Forefront's "anticipatory breach" claim is dependent upon the premise that Dr. Sexton is enrolled in an illegal system of peonage.

Even if Forefront's anticipatory breach claim did not rely upon compelling Dr. Sexton into involuntary servitude, the Complaint fails to properly allege an actual anticipatory repudiation under Georgia law. When one party to a bilateral contract of mutual dependent promises absolutely refuses to perform and repudiates the contract prior to the time of his performance, the innocent party is at liberty to consider himself absolved from any future performance on his part. *CCE Fed. Credit Union v. Chesser*, 150 Ga. App. 328, 330, 258 S.E.2d 2 (1979). "[T]he breach which will form the basis for this type of action is an unqualified repudiation of the entire contract prior to the time for performance. The repudiation must go to the whole contract." *Oconee Fed. Sav. & Loan Ass'n v. Brown*, 351 Ga. App. 561, 831 S.E.2d 222, (2019), *citing Esquire Carpet Mills v. Kennesaw Transp., Inc.*, 186 Ga. App. 367, 370, 367 S.E.2d 569 (1988). It is undisputed that Dr. Sexton remains employed with Forefront. Her letter requests a mutually amicable departure date,

a remedy the contract specifically allows. *See*, Section 5.1.2 (termination at any time upon mutual agreement). Thus, she has not repudiated the whole contract. She wrote to Forefront trying to find a solution that would allow her to be reunited with her husband and son at some point in the future.

"A willingness to negotiate an offer of performance at variance with the terms of the agreement demonstrates the offering party's intention to abide by the contract and does not result in an anticipatory breach." *Jones v. Solomon*, 207 Ga. App. 592, 428 S.E.2d 637 (1993). In *Jones v. Solomon,* a physician provided a 90-day notice of termination of his employment contract to an employer, and then began to discuss with the employer his obligations during and after the transition period. Part of those discussions involved questioning whether the noncompete covenants in the agreement were enforceable. The Court of Appeals held that an attempt to negotiate and reach agreement as to the meaning, and enforceability, of the employment agreement did not amount to an anticipatory repudiation of the contract.

The letter sent by Dr. Sexton to Forefront is an attempt to reach a solution regarding her changed family circumstances in the face of Forefront's demands for her involuntary servitude. In the letter, which must be accepted as true, Dr. Sexton offers to continue her employment with Forefront in Illinois, to cooperate with Forefront in identifying other physicians, to continue to work with Forefront to minimize any impact on her unanticipated family circumstances, to find an amicable solution with Forefront, and even to stay longer to assist with the transition if requested. None of this can be read as a repudiation of the whole contract with Forefront.

Moreover, even under an "anticipatory breach" theory, Forefront has no possible way of proving its damages. "The doctrine of anticipatory breach is not a doctrine which fictitiously moves the performance ahead to the time of the repudiation, and regards the repudiation as a failure to perform the contract." *Phosphate Mining Co. v. Atlanta Oil & Fertilizer Co.*, 20 Ga. App. 660,

93 S.E. 532 (Ga. App. 1917) (citing 2 Sedgwick on Damages, § 636(d)). "The tender of an anticipatory breach does not change the time at which the damages are to be estimated, nor affect the general rule of damages; but if the tender is accepted by the opposite party, that party acts thereafter under the rule of avoidable consequences." *Id.*

Even if Forefront's peonage contract were enforceable and even if an "anticipatory repudiation" occurred, Forefront still has an obligation to mitigate its damages and to determine any "loss" it might incur based upon whether it actually hires a replacement for Dr. Sexton, not based on an "unadorned, the-defendant-unlawfully-harmed-me accusation." Even if an anticipatory breach could have been alleged to occur, and even if the proper remedy was something other than forced labor, the Complaint on its face seeks nothing but speculative future damages.

Finally, the quixotic nature of Forefront's claim here is further emphasized by the law of anticipatory repudiation. Under O.C.G.A. § 13-4-22, and basic contract law, when one party (here Forefront) offers to perform and the other party here (allegedly Dr. Sexton) refuses to perform, Forefront "shall be discharged from the performance of [its] part of the contract." In other words, even if Dr. Sexton is "breaching" the contract by refusing to labor for Forefront, that merely ***gives Forefront the right to terminate her employment***. Either way, the employment relationship terminates. Forefront fails to state a claim for relief that can be granted.

5.    The Employment Agreement's Promise of Employment for a Definite Term is Illusory and Dr. Sexton is an Employee at Will.

"An illusory promise exists when a condition of the contract is completely within the control of the promisor. This is because to agree to do something and reserve the right to cancel the agreement at will is no agreement at all." *NGM Ins. Co. v. Abate*, 367 Ga. App. 419, 885 S.E.2d 305 (2023)(citations and internal quotations omitted). Georgia courts have favorably relied upon

commentary in the Second Restatement of Contracts, which discusses illusory promises as follows:

[w]ords of promise which by their terms make performance entirely optional with the promisor whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in the expectation of performance.

Restatement, 2nd Contracts, § 2, Comment (e); *Kemira, Inc. v. Williams Investigative Services, Inc.*, 215 Ga. App. 194, 450 S.E.2d 427 (1994).

Here, Forefront's lawsuit rests on the false premise that it made a mutually enforceable commitment to employ Dr. Sexton for a three-year term. The contract shows it made no such promise. Forefront's Section 5.1.3 of the Employment Agreement reserves at least 14 different reasons why Forefront – but not Dr. Sexton – can immediately terminate the employment relationship. Of those, 9 of the 14 conditions are ones that are decided upon by Forefront "in its sole discretion." *See*, Section 5.1.3(g) through (n). Those reasons include violation of employment rules (g), failure to perform adequately (k), insubordination (j), or any act that Forefront decides is harmful (n).

Based upon the allegations in the Complaint, Dr. Sexton's request to be reunited with her family in Chicago provides Forefront with at least *six* different reasons to terminate her employment immediately. The provisions excusing Forefront "at its sole discretion" include: (f) conduct that "injures" Forefront, (g) violation of an employment rule, (h) "dishonesty", *See*. Comp. ¶ 25 (alleging Dr. Sexton "concealed" her intent to move to be with her family); (j) insubordination or failure to follow a company directive; (k) failure to perform job duties, and (n) harming the business of Forefront. Every one of those is determined by Forefront "in its sole discretion" meaning Dr. Sexton has no contractual right to determine whether these reasons for termination

do or do not exist. Thus, Forefront's contract purports to show that it owes her no further employment, but she owes it $820,000 for the exact same facts.

Read as a whole, the Forefront employment agreement is so one-sided, and provides so many reasons for Forefront, "in its sole discretion" to immediately terminate Dr. Sexton that any promise by Forefront to employee Dr. Sexton for the remainder of the three-year term is simply illusory, and subject to Forefront's "sole discretion." The only fair reading is that Forefront seeks to employ Dr. Sexton at its will, but force her servitude at its threat of financial harm. The Court should hold that the contract's promise of a definite term is illusory and Forefront essentially has the right to terminate Dr. Sexton at will. Forefront's claim for damages arising out of the termination of a *de facto* employment at will relationship cannot be granted.

B.    <u>Forefront's Claims are Not Ripe for Adjudication, Depriving this Court of Jurisdiction Under Fed. R. Civ. P. 12(b)(1).</u>

Even if the foregoing arguments were not applicable, this Court still would not have subject matter jurisdiction over this case under Fed. Civ. P. 12(b)(1) and it would still have to be dismissed, as Forefront's claims are not ripe for adjudication.

When a claim rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all," it is not ripe for adjudication. *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257 (1998); *Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008). A plaintiff's asserted injury may depend on so many future events that a judicial opinion would be advice about remote contingencies — and this aspect of ripeness is part of the case-or-controversy requirement, s*ee Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485 (1993); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 92 S.Ct. 1716 (1972); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006). A claim that lacks ripeness is not justiciable, and thus the absence of ripeness precludes the exercise of federal jurisdiction. *Cowan v. Provident Life & Accident Ins.*

*Co.*, No. 18-cv-21156, 2018 WL 7577756, at *2 (S.D. Fla. Nov. 27, 2018) (Williams, J.). A claim that lacks ripeness should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010).

A claim for breach of contract stemming from anticipatory repudiation is ripe for Article III purposes not at the time of the repudiatory act but rather when "performance becomes due or when the other party to the contract opts to treat the repudiation as a present total breach." *Franconia Ass'n v. United States*, 536 U.S. 129, 143 (2002); *See Roehm v. Horst*, 178 U. S. 1, 13 (1900) (repudiation "give[s] the promisee the right of electing either to...wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract").

It is undisputed that Dr. Sexton remains employed at Forefront at least until December 1, 2023, which would be more than two years since her initial hire date. So on the face of the Complaint, Forefront cannot plausibly claim she has totally repudiated the entire contract. Even if she has, however, the undisputed facts show that Forefront has not renounced its obligation to perform under the contract, because Dr. Sexton is still employed. As such, the case is not ripe until an actual breach of the contract occurs.

In *Franconia Ass'n v. United States*, 536 U.S. 129, 143 (2002), the U.S. Supreme Court dealt with a statute of limitations question that turned on whether a federal agency's stated intent not to accept loan prepayments in the future was a repudiation of the contract that required immediate suit or whether the statute began to run when the payments were actually refused (the date of breach). The U.S. Supreme Court held the controversy was not ripe until the payments were actually refused, and the breach occurred. The logic of *Franconia* compels the conclusion

-20-

that an anticipatory repudiation claim is not ripe for subject matter jurisdiction or amount in controversy purposes, until a breach actually occurs.

Forefront's thinly-veiled actual intent – to involuntarily compel Dr. Sexton to continue in service to her master – is revealed by the premature filing of this lawsuit in Wisconsin. If Forefront is seeking liquidated damages, it is an unenforceable penalty; if it seeks actual damages, the claim is not ripe and must be dismissed for lack of subject matter jurisdiction. Either way, this lawsuit has no merit and is only intended to threaten and bully Dr. Sexton, in violation of the TVPA.

This Court's diversity jurisdiction depends on the amount that was in controversy **when the federal suit began**. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 293, 58 S.Ct. 586 (1938); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006). The current actual damages suffered by Forefront is zero, far less than the amount necessary to satisfy diversity jurisdiction. The only way Forefront meets the amount in controversy needed for diversity jurisdiction is to enforce an illegal penalty clause. Either way the claim must be dismissed.

C.  Forefront's Claim for Breach of the Duty of Good Faith and Fair Dealing Fails to State a Claim for Relief Which Can Be Granted.

Forefront's Claim II, for breach of the implied covenant of good faith and fair dealing, also fails to state a claim for relief that can be granted. In Georgia, such a claim is not an independent cause of action. *See Greenwald, v. Columbus Bank & Trust Co.,* 228 Ga. App. 527 (1997). If the underlying breach of contract claim fails, so to must the claim for breach of the duty of good faith and fair dealing. *See Physician Specialists in Anesthesia, P.C. v. MacNeill*, 246 Ga. App. 398 (2000).

Despite the foregoing, Forefront complains that Dr. Sexton did not tell Forefront about her husband's career change and her son's relocation soon enough. It is unclear why the Employment Agreement places any duty upon Dr. Sexton to keep Forefront apprised of developments in her

personal life. It would be a bizarre interpretation of the contract to require an employee to waive all privacy rights regarding her personal life as a condition of employment. It is unsurprising, however, that Forefront assumes that Dr. Sexton has no rights which it is bound to respect.

Notwithstanding the lack of any duty to update the company on the status of one's marriage and child rearing decisions, Georgia also places no duty on an employee to apprise an employer of any thoughts about a change in careers before a decision is made. "An employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. Even before the termination of his agency, he is entitled to make arrangements to compete and upon termination of employment immediately compete." *Instrument Repair Service, Inc. v. Gunby*, 238 Ga. App. 138, 518 S.E.2d 161 (1999).

Additionally, "there can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." *Wanna v. Navicent Health, Inc.*, 357 Ga. App. 140, 850 S.E.2d 191 (2020); *Ameris Bank v. Alliance Investment & Mgmt. Co.*, 321 Ga. App. 228, 233-234, 739 S.E.2d 481 (2013). Here, the letter from Dr. Sexton attached to the Complaint unequivocally states that she is seeking a mutually agreeable end of her employment with Forefront at some future date. Section 5.1.2 states that the Employment Agreement can be terminated at any time upon the mutual agreement of the parties. Dr. Sexton's efforts to seek a mutually agreeable termination are within her rights under the contract and cannot form the basis for an independent breach of the duty of good faith and fair dealing.

To the extent the Complaint seeks recovery for an "anticipatory" breach of the duty of good faith and fair dealing, there is no case in Georgia (or likely anywhere else) creating a cause of action for "anticipatory" bad faith in the absence of a breach of contract. The only basis for

-22-

Forefront's "fair dealing" claim is that it believes Dr. Sexton has no right to a personal family life, and no right, for any reason, ever, to seek to end her master/servant relationship with Forefront.

## CONCLUSION

Forefront in this lawsuit seeks to go in reverse – back in time to the days of slavery, peonage, sharecropping and trafficking. This tone-deaf lawsuit, instead of letting a professional physician amicably depart due to changed family circumstances, seeks to use threat of massive debts to compel Dr. Sexton, an African-American woman, to remain in the south in coerced servitude, when all she wants is to be reunited with her husband and child. In addition to being a moral embarrassment, Forefront's lawsuit lacks subject matter jurisdiction and fails to state a claim upon which this Court can grant relief. It should be dismissed, with prejudice.

Respectfully submitted: November 2, 2023.

**OVB LAW & CONSULTING S.C.**

By: s/ *Emil Ovbiagele*
Emil Ovbiagele, WI Bar No. 1089677
Kate Goodhart, WI Bar No. 1121648
826 N. Plankinton Avenue, Suite 600
Milwaukee, Wisconsin 53203
Telephone: 414-585-0588
Facsimile: 414-255-3031
Email: emil@ovblaw.com
Email: kate@ovblaw.com

**DELCAMPO GRAYSON LOPEZ LLC**

By: s/ *Randall D. Grayson*
Randall D. Grayson (admitted *pro hac vice*)
Ga Bar. No. 306560
Dax E. López (admitted *pro hac vice*)
Ga Bar No. 457888
5455 Chamblee Dunwoody Road
Dunwoody, Georgia 30338

-23-

Telephone: 770-481-0444
Facsimile:  770-395-0806
Email: rgrayson@dglattorneys.com
Email: dax@dglattorneys.com

*Attorneys for Defendant Shenara Austin Sexton*